# IN THE COURT OF APPEALS OF IOWA

No. 19-0981
Filed July 1, 2020

**STATE OF IOWA,**
        Plaintiff-Appellee,

**vs.**

**MICHAEL BUMAN,**
        Defendant-Appellant.

_____

Appeal from the Iowa District Court for Plymouth County, Steven J. Andreasen, Judge.

Michael Buman appeals his conviction of wanton neglect of a resident in a health care facility. **CONVICTION REVERSED AND REMANDED.**

Priscilla E. Forsyth, Sioux City, for appellant.

Thomas J. Miller, Attorney General, and Linda J. Hines, Assistant Attorney General, for appellee.

Considered by Vaitheswaran, P.J., and Doyle and May, JJ.

**DOYLE, Judge.**

Michael Buman appeals his conviction of wanton neglect of a resident in a health care facility, which stems from October 2016 events at the residential care facility where Buman worked as a registered nurse. The State alleged that Buman discontinued a resident's antipsychotic medication without a doctor's authorization, which caused the resident to have a psychotic episode and require hospitalization. Buman admits he noted the resident's medication had been discontinued on the medication administration record (MAR). But he claims that the facts available to him at the time led him to conclude the resident's medication had been discontinued and he was only trying to correct an apparent clerical error.

On appeal, Buman challenges the evidentiary ruling allowing the State to introduce the standard of care for registered nurses into evidence and the jury instruction that addressed that evidence. He also challenges the sufficiency of the evidence supporting the finding that he knowingly acted in a way that would likely injure the resident.

**I. Background Facts and Proceedings.**

In October 2016, Buman was a nurse employed at a health care facility in Le Mars. He worked what is called the night shift, starting at 6 p.m. and finishing at 6 a.m. At around 8 p.m. on October 18, 2016, Buman was administering medication when one of the facility's residents asked Buman about his clozapine prescription. According to Buman, the resident asked "why he wasn't getting it anymore because he had not had it for a quantity of days." After checking the medications he was dispensing, Buman verified that clozapine was not included and told the resident he would look into it.

The MAR shows the resident's clozapine had not been administered at least two of the three days before Buman's October 18 shift. Jane Ream, a registered nurse with over forty years of experience, dispensed the resident's medications during the night shift on October 15 and 16. When Ream discovered that the resident's clozapine had not been included in the two-week supply of medication the pharmacy had delivered on October 13, she marked "NA," meaning "not available," next to clozapine on the MAR for October 15. Following the facility's policy, Ream informed the nurse on the day shift that the resident's clozapine was missing and that she would need to contact the pharmacy. But when Ream began her shift the next night, the clozapine was still missing. Ream again marked it as "NA" on the MAR for October 16. At the shift change, she alerted the nurse that the clozapine was missing.

On October 17, a certified medication aide dispensed the resident's medications. The aide initialed that date on the MAR to show he had given the resident clozapine along with his other medications. But, like Ream, Buman could not find clozapine when he searched on October 18. Buman testified that after talking to the resident, he did the following to satisfy himself that the clozapine was not present:

> I went back. I looked in the bin immediately. There was no cassette there. I eventually, that evening, went through both med carts, every single cassette in every bin, in every drawer, confirmed that it was not misplaced from there, that it was not in the cupboard, in the pharmacy return bags, or was not located anywhere else in the nurse's station, period.

Buman believed that it had also been missing on October 17 and the aide had been on "automatic mode and went down the page and made the initials in the

appropriate spots" rather than independently verifying each of the medications was present.[1]

Based on the MAR and the resident's statement that he had not been given clozapine in several days, Buman concluded that it "had been discontinued or otherwise changed to something else and that [someone] had failed to make that notation in the MAR." Buman sought to correct what he believed to be a clerical error by writing "DC'ed," meaning "discontinued," under the entry for clozapine on the MAR.

Buman testified that he "checked every record that was available to [him], including the electronic records and did not find the medication listed recently." He admitted he did not check the resident's medical chart because it had been unavailable for some time before October 18 and was not present on that date as well. Although the residents' medical charts were typically kept in the nurse's station, both Buman and Ream testified that the charts were often locked in the director of nursing's office during the night shift and could not be accessed. The facility did not keep a log book of change orders. Buman testified it was not protocol to contact the director of nursing about a missing medication and the pharmacy was unavailable to contact overnight.

On October 27, the resident was hospitalized after experiencing a psychotic episode. Hospital notes state that the resident experienced "worsening psychotic illness because his clozapine was inadvertently stopped on 10/18/2016." On the

---

[1] According to Buman, the staff provided the medications to each resident in a cup to take all together and, afterward, marked each off on the MAR rather than marking the MAR for each medication after distributing them individually.

incident report form completed by the facility's administrator, the event was categorized as a "minor incident" resulting from a "[p]rescription medication error." The report states the facility acted to provide immediate training to all medication passers and implemented a new process to ensure medication was not discontinued without a doctor's order.

No further action was taken until January 2018, when the State began investigating the facility for reasons unrelated to Buman. During that investigation, Ryan Dostal, a State investigator, learned from other employees that Buman "on his own and without doctor authorization" had discontinued the antipsychotic medication in October 2016. After interviewing Buman, Dostal determined there was probable cause to charge him with wanton neglect of a resident of a health care facility.

The State filed felony criminal charges against Buman in July 2018.[2] The matter was tried to a jury in April 2019. In her testimony, the facility administrator refuted Buman's claim that the medication was missing on October 18. She disagreed that the medical aide who initialed the MAR on October 17 could have made a mistake in doing so. Although she admitted that she was not involved in the medication delivery and did not contact the pharmacy herself, she viewed the medical aide's initials on the MAR as proof that the pharmacy delivered clozapine after Ream's October 16 shift. The medical aide who gave the resident his

---

[2] The State charged Buman with wanton neglect of a resident of a health care facility resulting in serious injury, in violation of Iowa Code sections 726.7(1) and 726.7(2) (2015), a Class C felony. The jury found Buman guilty of the lesser-included offense of wanton neglect of a resident of a health care facility, an aggravated misdemeanor.

6

medication on October 17 did not testify at trial, and there was no evidence the pharmacy delivered clozapine sometime between October 13 and October 18.

It is against this backdrop that the State argued Buman on his own discontinued the resident's medication without a doctor's authorization. Buman denied the allegation, asserting he did not discontinue the medication but, based on what he knew at the time, merely noted the medication had been discontinued.

Over Buman's objection, the court admitted into evidence Exhibit 15, which reproduced the minimum standards of nursing practice for registered nurses as set forth by the Iowa Board of Nursing in Iowa Administrative Code rule 655-6.2(5). The exhibit includes the entire rule. Relevant to the arguments here, the rule states in part:

> The registered nurse shall recognize and understand the legal implications of accountability. Accountability includes but need not be limited to the following:
> . . . .
> e. Executing the regimen prescribed by a physician. In executing the medical regimen as prescribed by the physician, the registered nurse shall exercise professional judgment in accordance with minimum standards of nursing practice as defined in these rules. If the medical regimen prescribed by the physician is not carried out, based on the registered nurse's professional judgment, accountability shall include but need not be limited to the following:
> (1) Timely notification of the physician who prescribed the medical regimen that the order(s) was not executed and reason(s) for same.
> (2) Documentation on the medical record that the physician was notified and reason(s) for not executing the order(s).

Iowa Admin. Code r. 655-6.2(5).

At the close of evidence, the court instructed the jury that to find Buman guilty of wanton neglect of a resident of a healthcare facility, the State had to prove beyond a reasonable doubt that Buman "knowingly acted in a manner likely to be

injurious to the physical or mental welfare" of a resident of the facility at which Buman worked. The jury instructions state that Buman acted "knowingly" if "he had a conscious awareness that he was acting in a manner likely to be injurious to the physical or mental welfare of" the resident. At the State's request and over Buman's objection, the court also gave the following instruction, Instruction 17, regarding Exhibit 15:

> In accordance with the standards in the Iowa Administrative Code, a registered nurse is required to follow a medical regimen prescribed by a physician. If a medical regimen prescribed by a physician is not carried out by a registered nurse, the registered nurse is required to timely notify the physician who prescribed the medical regimen and also document on the medical record that the physician was notified and the reason for not executing the physician's order. A violation of this standard, in and of itself, is not a criminal act. You may consider this standard only in determining whether the State has proven beyond a reasonable doubt the elements of the charge . . . .

The jury returned a verdict finding Buman guilty of wanton neglect of a resident of a health care facility.

**II. Discussion.**

Iowa Code section 726.7 states that "[a] person commits wanton neglect of a resident of a health care facility when the person knowingly acts in a manner likely to be injurious to the physical or mental welfare of a resident of a health care facility." The appellate courts have interpreted this section to prohibit "intentionally or willfully engaging in conduct that probably would cause an injury to the body," *State v. McKee*, 392 N.W.2d 493, 495 (Iowa 1986) (addressing the physical welfare component), or "cause emotional or psychological injury or harm," *State v. Cunningham*, 493 N.W.2d 884, 888 (Iowa Ct. App. 1992) (addressing the mental welfare component).

On appeal, Buman challenges: (1) the ruling admitting Exhibit 15 into evidence, (2) Jury Instruction 17 related to that exhibit, and (3) the sufficiency of the evidence supporting his conviction. Although Buman raises these issues separately, all three relate to whether he knowingly acted in a manner likely to cause injury to the resident. Buman argues the trial court abused its discretion in admitting the exhibit into evidence and erred in instructing the jury regarding the exhibit because the exhibit and the instruction confused and misled the jury on this element. *See State v. Williams*, 929 N.W.2d 621, 628 (Iowa 2019) (stating that we review evidentiary rulings for abuse of discretion); *State v. Harrison*, 914 N.W.2d 178, 188 (Iowa 2018) (stating that we review jury instructions for errors at law). He argues there is insufficient evidence to support the jury's finding that the State proved the "knowingly" element beyond a reasonable doubt. *See State v. Benson*, 919 N.W.2d 237, 241 (Iowa 2018) (stating we review claims on the sufficiency of the evidence for correction of errors at law).

Buman complains that Exhibit 15 is misleading because, although a violation of the minimum standard of care may be relevant in a license revocation hearing, it does not require that a nurse intentionally act in a way that would probably cause an injury. Buman views the exhibit as effectively changing the offense to one of strict liability. He argues:

> The Iowa Administrative Code does not trump the elements of an offense in a criminal case. Because it was possible to violate the standards on Exhibit 15 without knowingly acting in a manner likely to be injurious to a resident of a residential facility, the exhibit is misleading, irrelevant and gave the jury a different standard to follow than the elements of the offense as set out in the jury instructions.

The State counters that the Jury Instruction 17 states that violating the minimum standard of care does not equal a criminal act. Although the instruction states that the jury may only consider the minimum standard of care in determining whether the State proved the elements of the offense, Buman complains it does not specify which element of the offense the minimum standard of care relates to. And to confuse the matter further, the language of Exhibit 15 refers to "the legal implications of accountability." With no further explanation on what these legal implications are, Buman argues that the jury could infer that they refer to criminal accountability.[3]

The law requires the trial court to give a jury instruction as long as it correctly states the law, applies to the case, and is not stated elsewhere in the instructions. *See State v. Hunt*, 801 N.W.2d 336, 375 (Iowa 2011). But a jury instruction that misstates the law, confuses, or misleads the jury is prejudicial and requires reversal. *See id.*; *see also State v. Mathias*, 936 N.W.2d 222, 226 (Iowa 2019). We agree that when viewed together, the language used in Exhibit 15 and the jury instruction could confuse the jury or lead it to misapply the law on whether Buman knowingly acted in a manner likely to injure the resident. On this basis, we may reverse Buman's conviction and remand for new trial.

Because the issue may arise again on retrial, we address the admission of Exhibit 15. While admission of the minimum standard of care would be appropriate in a disciplinary action, it was ill advised here. We cannot say the rule would be

---

[3] "Accountability" is defined in the administrative rules as "being obligated to answer for one's acts, including the act of supervision." Iowa Admin. Code r. 655-6.1. "Accountability" was not defined in the jury instructions.

inadmissible under any circumstance, but in view of its limited relevance in a criminal setting and with a potential to confuse a jury, extreme caution must be exercised if it is offered up again on retrial.

Finally, we must address Buman's challenge to the sufficiency of the evidence supporting his conviction. *See State v. Kern*, 831 N.W.2d 149, 158 (Iowa 2016) ("[T]he Double Jeopardy Clause [does] not permit a retrial of the charge[] if there was insufficient evidence of guilt presented at trial."). We review this claim for correction of errors at law. *See id.* We are bound by the jury's verdict unless it lacks substantial evidence to support it. *See State v. Hickman*, 576 N.W.2d 364, 366 (Iowa 1998). In determining whether the verdict is supported by substantial evidence, we view the evidence in the light most favorable to the State, "regardless of whether it is contradicted, and every reasonable inference that may be deduced therefrom must be considered to supplement that evidence." *State v. Harris*, 891 N.W.2d 182, 186 (Iowa 2017) (quoting *State v. Jones*, 281 N.W.2d 13, 18 (Iowa 1979)). "In determining whether retrial is permissible all the evidence admitted during the trial, including erroneously admitted evidence, must be considered." *State v. Dullard*, 668 N.W.2d 585, 597 (Iowa 2003).

Although we might have reached a different verdict, it is not a basis for concluding there is insufficient evidence to find Buman guilty. *See State v. Schenk*, 262 N.W. 129, 131 (Iowa 1935) ("[T]his court cannot interfere with the verdict simply because there was evidence to the contrary and upon which the jury might have reached a different verdict.").

> Although we review all of the evidence in determining its legal sufficiency to support the verdict, we do not ourselves determine whether the evidence established guilt beyond a reasonable doubt.

> Instead, the relevant question is whether, after viewing all the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.
>
> Inherent in our standard of review of jury verdicts in criminal cases is the recognition that the jury was free to reject certain evidence and credit other evidence.

*State v. Anderson*, 517 N.W.2d 208, 211 (Iowa 1994) (citation omitted), *overruled on other grounds by State v. Heemstra*, 721 N.W.2d 549, 558 (Iowa 2006).  So bound by the constraints of our standard of review, we must conclude that sufficient evidence supports the jury's verdict when viewed in the light most favorable to the State.  We therefore reverse Buman's conviction based on the jury instruction about the minimum standard of care for registered nurses, and we remand for a new trial.

**CONVICTION REVERSED AND REMANDED.**

Vaitheswaran, P.J., concurs; May, J., dissents.

**MAY, Judge** (dissenting).

Michael Buman was "entitled to a fair trial but not a perfect one." *Lutwak v. United States*, 344 U.S. 604, 619 (1953). While the jury instructions in this case may not have been perfect, I am confident this jury understood its duty—and that Buman received a fair trial. He is not entitled to a second. I respectfully dissent.

We entrust jurors with enormous responsibility—and justifiably so. We believe our jurors are "intelligent and impartial." *Fowle v. Parsons*, 141 N.W. 1049, 1050 (Iowa 1913). And they carry "the common knowledge and experience" of our citizenry. *Id.* (quoting *Moore v. Chicago, R.I. & P. Ry. Co.*, 131 N.W. 30, 32 (Iowa 1911)). When united as a jury, they constitute "the most efficient and certain means by which a court of justice can draw truth out of . . . chaos." *Callanan v. Shaw*, 24 Iowa 441, 449 (1868).

So, of course, we can trust jurors to make the sort of common-sense distinctions that most any reasonably-intelligent adult would make. *See State v. Manning*, 224 N.W.2d 232, 236 (Iowa 1974) ("Jurors do not abandon their common knowledge about the affairs of the world when they enter the jury box."). And so we should trust that this jury understood the difference between (1) an administrative code that set standards for the practice of nursing and (2) the crime of Wanton Neglect of a Resident of a Healthcare Facility—whose elements were clearly explained in Instruction 15.[4] And in case there was any risk of confusion,

---

[4] Instruction 15 stated:

> In regard to the charge of Wanton Neglect of a Resident of a Heathcare Facility Resulting in Serious Injury, the State must prove beyond a reasonable doubt the following numbered elements:
> 1. On or about the 18th day of October, 2016, in Plymouth County, Iowa, Defendant Michael Buman knowingly acted in a

it was erased by Instruction 17, which plainly stated that a violation of the administrative standard "is not a criminal act." So we can trust the jury convicted Buman only because it believed the "State . . . prove[d] beyond a reasonable doubt" the elements marshaled in Instruction 15, including the requirement that Buman "knowingly acted in a manner likely to be injurious to the physical or mental welfare of [the resident]." *See State v. Sanford*, 814 N.W.2d 611, 620 (Iowa 2012) ("Jurors are presumed to follow instructions.").

Of course, because humans write them, jury instructions probably never embody "perfect clearness and precision." *Law v. Bryant Asphaltic Paving Co.*, 157 N.W. 175, 177–78 (Iowa 1916). There will probably always be some room for improvement. *See id.* ("It is probably true that no instruction or charge to a jury has ever been drawn with such perfect clearness and precision that an ingenious lawyer in the seclusion and quiet of his office with a dictionary at his elbow cannot extract therefrom some legal heresy of more or less startling character.").

---

manner likely to be injurious to the physical or mental welfare of [the resident].

2. At said time and date, [the resident] was a resident of a healthcare facility. The Pride Group RCF is a healthcare facility.

3. The acts of Defendant Michael Buman resulted in serious injury to [the resident].

If the State has proven all of the above-numbered elements, Defendant Michael Buman is guilty of Wanton Neglect of a Resident of a Healthcare Facility Causing Serious Injury. If the State has proven Elements 1 and 2 but has failed to prove Element 3, Defendant Michael Buman is guilty of Wanton Neglect of a Resident of a Healthcare Facility. If the State has failed to prove Element 1 or 2, Defendant Michael Buman is not guilty.

Instruction 15A clarified: "For Defendant Michael Buman to do something knowingly means he had a conscious awareness that he was acting in a manner likely to be injurious to the physical or mental welfare of [the resident]."

Fortunately, though, our law does not "require perfection." *Rivera v. Woodward Res. Ctr.*, 865 N.W.2d 887, 902 (Iowa 2015). Rather, a case must be retried only if the instructions were so "misleading and confusing" that "it is 'very possible' the jury could reasonably have interpreted the instruction[s] incorrectly." *Id.* (citation omitted).

That did not happen here. In my view, the instructions were not "misleading" or "confusing." *See id.* In any event, it is not "very possible" the jury misunderstood its duty to convict only if the "State . . . prove[d] beyond a reasonable doubt" the elements marshaled in Instruction 15. *See id.*

Reversal is not warranted. I respectfully dissent.